**In re the MARRIAGE OF Harriet SCHULZ and Calvin W. Schulz.**

**Harriet SCHULZ, Petitioner-Respondent,**

v.

**Calvin W. SCHULZ, Respondent-Appellant.**

**No. 39408.**

Missouri Court of Appeals, Eastern District, Division Three.

May 29, 1979.

Hollingsworth & Kramer, Alice L. C. Kramer, Farmington, for respondent-appellant.

Gunn & Gunn, Donald Gunn, Sharon R. Wice, Donald Gunn, St. Louis, for petitioner-respondent.

KELLY, Judge.

Calvin W. Schulz, appellant, appeals from a judgment of the Circuit Court of Jefferson County dissolving his marriage to Harriet Schulz, the respondent, ordering him to pay her $50.00 per week as maintenance and dividing marital property between the parties. On appeal he raises six grounds for reversal of the judgment; however, only one of them preserves anything for review.[1] Neither party contests that part of the judgment which declares the marriage to be irretrievably broken. We affirm the judgment insofar as it grants the order of dissolution; however, for reasons hereinafter stated, we remand the cause to the trial court for further proceedings.

The major problem with this case is the attempt of the trial court to set apart the property, referred to in the transcript as the "family home" located at 2134 Lonedell Road in Arnold, Missouri, pursuant to the mandate of § 452.330 RSMo. Supp.1973. On the one hand, the respondent[2] has contended throughout these proceedings that this property was conveyed by means of a quit claim deed dated May 28, 1975, to Ella Kober and Clara Rullkoetter (hereinafter "the sisters") and was not marital property when this cause was instituted. Appellant, on the other hand, has contended throughout this proceeding that he did not join in the quit claim deed of May 28, 1975, and that what purports to be his signature on the deed is, in fact, a forgery. The trial court did not decide this issue; rather, it set aside to respondent, as her sole and exclusive property: "Any and all right, title and interest remaining in the parties" in this property.

As we understand this judgment, whether respondent has any interest in the property on Lonedell Road and receives anything of value by reason of this decree and judgment remains to be determined in some other proceeding. The trial court has not exhausted its jurisdiction and determined whether the Lonedell Road property is marital property, *Anspach v. Anspach,* 557 S.W.2d 3, 6[3] (Mo.App.1977).

■■■ Respondent instituted this dissolution of marriage proceeding on February 16, 1976. The cause was tried on her first amended petition and appellant's amended answer and counterclaim.[3] Neither respondent's original petition nor first amended

1. See appendix at end of this opinion for the Points Relied On as they appear in appellant's brief.

2. The parties are referred to by the title applied to their status on appeal, not in the trial court.

3. The transcript on appeal contains respondent's petition and appellant's answer. The pleadings on which the cause was tried are contained in the Statement of Facts in appellant's brief. This is a violation of Rule 81.14(a) which requires that the transcript on appeal include, in chronological order "the pleadings upon which the action was tried." The general rule restricts an appellate court's review to matters set forth in the approved transcript, Rule 81.12(b); *State ex rel. Freeze v. City of Cape Girardeau,* 523 S.W.2d 123, 127[5] (Mo. App.1975). However, because of the fact both sides argued the propriety of the disposition made of the "family home" by the decree entered in the trial court and the unique issue raised thereby, we shall consider the pleadings incorporated as aforesaid just as if there had been a compliance with Rule 81.14(a).

petition contained any request for a division of marital property. Appellant's answer and first amended answer and counterclaim did, however, allege the ownership of a "family home" and prayed that their property be divided between them "according to the contributions of each party to the marriage."

The evidence at trial was that the parties were married on October 19, 1951, and that they lived together until August 18, 1975, when they separated. No children were born of this union. Although respondent had been employed as a "head checker" for Globe Drug and Sands Drug, she has not been employed since 1973 because of her age and arthritis. There is no evidence in the record concerning respondent's earnings during that period of time in the marriage when she did work. At trial time, March 9, 1977, she was under the care of a physician because her arms, fingers and hips ached all the time.

Respondent testified that she had income of $225.00 per month. She paid rent of $100.00 per month. Her total expenses, including the rent were $888.00 monthly. Appellant had not given her any money since August, 1975. She continued living in the Lonedell property after she and appellant separated. Prior to their separation appellant gave her cash weekly, sometimes $170.00 and sometimes less.

There was testimony concerning three parcels of real estate. One parcel, Lot 1 of Werner's Sunset Lake Subdivision in Ste. Genevieve County, Missouri, was purchased in December of 1965, for $750.00 and title was taken in respondent's name alone. According to the respondent's testimony, her uncle, Al Rosebeck, since deceased, gave her the money to purchase this parcel. Another parcel was a lot identified as the Table Rock property, which she conceded was marital property. Concerning the "family home" on Lonedell Road, respondent testified she sold it to the sisters who had been neighbors of the parties for more than 20 years, as previously noted hereinabove.

Respondent also testified that she owned one automobile, a 1969 Chevrolet Belair, and the appellant owned a 1975 Chevrolet pick-up truck. The house on Lonedell Road contained household furnishings and furniture which she asked the trial court to set aside for her. Her attorney also had in his possession an income tax refund of approximately $1400.00 on their 1975 federal income taxes.

Respondent owed her uncle's estate $6,000.00, which she testified he lent her to pay off the old house and build the new one on Lonedell Road. In calculating her monthly expenses she included in that amount $250.00 a month to repay this loan. She owed back rent in the amount of $1600.00 to the sisters.

She testified that during the marriage she handled all of the finances; her husband would give her the money and she would pay the bills.

With respect to the quit claim deed to the Lonedell Road property, the respondent testified that sometime in December of 1974 and January of 1975 she and her husband discussed the conveyance of the property to their neighbor ladies. This discussion took place because he wasn't working and the bank was calling her about the house payments. "We was going to lose the house." They were three months behind in their payments. They did not discuss putting the house up for sale. She did not know its fair market value at the time although she did believe it was worth more than they received for it. In January, 1975, respondent, in her husband's presence, discussed the conveyance of the property to the two sisters. Appellant "okayed" the conveyance and signed the quit claim deed in her presence. Sometime in February, 1975, Ms. Kober paid off the $10,185.00 mortgage on the house;[4] the respondent was with her when this was done at the Concord Bank. Ms. Kober was given the cancelled notes. Nevertheless, the quit claim deed conveying the property was not executed until May, 1975, when she and Ms. Kober went to an attorney in Hillsboro on May 9, 1975, and

---

4. Ms. Rullkoetter testified that the sisters paid $10,000.00 for the Lonedell property.

had him prepare the deed to convey the property. She paid the attorney to prepare the deed. The deed was signed by the appellant in the kitchen of their home at a time when only he and respondent were there. She did not sign the deed at that time but signed it in the presence of the attorney who prepared it. She knew nothing about the notarization of the deed. In October, 1975, she entered into the rental agreement with the sisters and up to the time of trial she had paid them $600.00. Ms. Rullkoeter corroborated this and further testified that if the $1600.00 due on the rent was not paid soon she and her sister would have to evict respondent. Respondent testified that she did not consider the Lonedell Road property marital property because "it does not belong to either one of us."

Over the 20 years that they have been friends and neighbors respondent has helped the sisters by cutting the grass, taking them to the doctor, doing grocery shopping for them, and during the summer she occasionally prepared bar-b-qued chicken for them. She denied that there was any agreement between her and the grantees under the quit claim deed to the Lonedell Road property that after this dissolution action was over they would convey the property back to her.

At the time of trial she had five rooms of household furniture, all of which was old and which she valued at about $500.00. This consisted of two twin beds and one double bed, three dressers, a living room set consisting of a couch and two chairs, an ice box, a washer, a dryer, two deep freezers, a refrigerator and a stove.

The appellant produced the attorney who prepared the quit claim deed for the Lonedell property in his case. He testified that his independent recollection of the matter was somewhat faint. He "faintly" remembered the respondent when he saw her when he came to the courthouse to testify and looked at her prior to giving his testimony. From his file he fixed the date on which he prepared the quit claim deed as May 9, 1975, because his fee for preparation

of the deed was paid in cash on that date. He was not certain whether there was more than one person who came to his office when he obtained the information necessary for the preparation of the deed. His file contained a letter from respondent dated August 12, 1975, instructing him to record the deed and he did, on August 18, 1975. He could not recall who paid his fee for preparing the deed, but after he returned the recorded deed to respondent she paid him the recording costs. He knew nothing about the notarization of the deed.

The notary public whose signature appeared on the jurat to the quit claim deed testified that the date on which the deed was notarized by her—May 28, 1975—she was employed at the First Missouri Bank, and identified her signature as the witnessing notary public on the deed. She had no remembrance of the circumstances surrounding her notarization of the document. She did not know either Calvin or Harriet Schulz and testified that she met Mrs. Schulz for the first time on February 14th at appellant's counsel's office.

Appellant testified that he was a cement mason and that his employment was seasonal and, depending on the weather, he could lose as much as three months work because of rain and the winter months. At trial time he was employed by Sprinkman's Insulating Company installing insulation at the Havana Power House in Havana, Illinois, earning $340.00 per week "take home" pay. In 1975 he earned about $17,000.00 and in 1974, $10,000.00. He did not know how much he earned in 1976 because he had not as yet received his W–2 Form. He had a room in St. Louis County for which he paid $35.00 per week, and while working in Havana, Illinois, he lived in a motel where he paid $45.70 for four days occupancy. His food cost him $9.00 per day. He hadn't been sending respondent any support money since 1975.

He testified that he did not know whether there was a loan on the Lonedell Road property because respondent handled those affairs. He denied that respondent advised him in late 1974 or early 1975 that they

were delinquent in their loan payments. He also denied executing the quit claim deed, but admitted that the signature on the deed looked like his signature. In his opinion the fair market value of the house on Lonedell Road was $40,000.00.

On cross-examination the appellant testified that signatures on two documents and a check [5] looked like his, but said he did not remember signing them, and therefore he was not sure that they were his.

Appellant testified that he owned the Lonedell Road property, the lot at Table Rock, the Werner's Lake property, and two cemetery lots. He knew nothing about respondent's uncle paying off the mortgage on the first house on the property on Lonedell. According to his account of the construction of the house on Lonedell, he and respondent owned 16 + acres in Otto, Missouri, and this property was sold for $5,000.00 to build the new house on the Lonedell location. He never met his wife's uncle, Al Rosebeck, and he was not sure whether she was loaned $6000.00 by Mr. Rosebeck as she had testified; he just did not know. The money she used to pay for the Werner Lake lot came from their monies. Why her name alone appeared on the deed to this lot he did not know. He had been the one to negotiate the purchase of this lot from Mr. Reinhold but he did not tell Mr. Reinhold in whose name title to the lot was to be taken; he told respondent to buy the property and it was to have been put in his name.

He considered that he had an interest in the furniture in the home and that he was entitled to half of it. He had an insurance policy at work on which respondent was the beneficiary; however, there was no evidence as to how much insurance was afforded by this policy. Although he was a member of the Cement Masons Local 527 he was working as a pipe insulator on a permit at that time. To maintain his membership in the Union he had to contribute $500.00 in dues a year and he could work only another four or five weeks on the job in Havana, Illinois, and still maintain his membership in the Cement Masons' Union.

Sylvester Reinhold testified in appellant's case that he knew the parties for about 25 years. He owned the lot in Werner's Sunset Lake Subdivision in 1965 and at that time he mentioned selling the lot to appellant. He never remembered talking with respondent about this. He identified his signature on the deed to the property but said he did not recall signing it. He recalled that he received $750.00 for the property but did not recall who gave him the money. He testified that he did not know the notary public whose jurat was on the deed nor who prepared the deed, but he did not have it prepared. He had told appellant the price he-wanted for the lot and appellant agreed to buy it. He also identified his signature on Petitioner's Exhibit No. 2—a receipt dated September 24, 1965, acknowledging the receipt of $750.00 from respondent for the Werner's Lake property. All of this receipt, except for the date, was handwritten in ink, the date, in pencil. He testified that the writing in ink was his handwriting, but that the pencilled date was not.

Clara Rullkoetter appeared as a witness in appellant's case. She was 77 years of age at the time. According to her testimony she and her sister, Ella Kober, purchased the Lonedell Road property from the parties. She talked with respondent about purchasing the property in February, 1975, when respondent couldn't make the payments. Although she never discussed this with the appellant she testified, without objection or motion to strike, that he knew about it. She furnished one half of the purchase price and her sister the other half. They gave the money to the respondent sometime in February, 1975, at the home of the parties. Ms. Kober and respondent then went to the bank with the money.

5. These documents, Petitioner's Exhibits Nos. 10, 11 and 12 were: 1) a note for $12,000.00 payable to the Bank of Concord Village dated July 31, 1970, secured by a deed of trust on the Lonedell Road property; 2) a note for $1400.00 payable to E. V. Barnhorst, dated September 20, 1954; and, 3) a check made payable to appellant's dentist, which was not received into evidence because respondent testified that she did not see appellant sign it.

She had no idea of the value of the property, but they bought it because they thought it was a good investment. They never had the property appraised prior to purchasing it and did not employ a real estate agent to handle the purchase.

Ms. Kober and respondent were friends of at least 20 years standing. She and her sister relied on respondent for transportation to the doctor, the grocery store, the laundromat, the bank, etc.; no one else afforded these ladies that service. Respondent also prepared meals for them everyday; mowed their lawn during the summer and trimmed their hedges and around their trees. She had also loaned respondent $800.00.

Respondent had the deed to the Lonedell Road property prepared and gave it to Ms. Kober in February, 1975. She had kept the deed in a vault at the Concord Bank. She learned from respondent that appellant denied he executed the deed, but she did not recall when she was told this. She had no agreement with the respondent that she would reconvey the property back to her. After the sale of the property the respondent continued residing there and was still residing there when the witness testified. She and her sister agreed with respondent on a monthly rental of $100.00.[6]

After the appellant's testimony concerning whether his signature was on Petitioner's Exhibits Nos. 10, 11 and 12, respondent was recalled and testified that she was present at the time the appellant wrote his signature on Petitioner's Exhibits Nos. 10 and 11 and that she saw him sign them. She was sure that the signature on each document was her husband's. However, with respect to the check, Petitioner's Exhibit No. 12, a check made payable to his

dentist on which she filed in the dentist's name in her handwriting, she was not present when the amount was filled in and the check signed because that was done at the dentist's office.

William H. Storer, a document examiner, testified for Ms. Schulz and in giving his opinion testimony on the question of the genuineness of Mr. Schulz's signature on the deed, stated that he had, prior to trial, compared the signatures on the quit claim deed with those on the two notes, Petitioner's Exhibits Nos. 10 and 11. He described the method he employed in making these comparisons and the basis for his opinion. It was his conclusion that the person who executed the Calvin Schulz signatures on Petitioner's Exhibits Nos. 10 and 11 also executed the Calvin Schulz signature on Petitioner's Exhibit No. 9, the quit claim deed.

Since the enactment of the Dissolution of Marriage Act of 1973, a trial court is mandated to set apart to each spouse his property and to divide the marital property in such proportions as the trial court deems just after considering all relevant factors. Sec. 452.330 RSMo.Cum.Supp.1973. The statute lists four factors the trial court must consider in making the distribution of the marital property; however, the trial court may take into consideration factors other than those listed therein in determining the division of marital property in a proceeding under the Act. *McLerran v. McLerran*, 562 S.W.2d 710, 713[2] (Mo.App. 1978). One purpose of § 452.330, supra, is to determine property interests of each spouse upon dissolution of marriage, to relieve parties from further litigation and to sever altogether the property relations be-

**6.** Ms. Ella Kober did not testify at trial because of some mix-up concerning whether a subpoena served on her at an earlier setting of the case had been continued when the cause was passed. The transcript does not reflect any request by the appellant that her deposition filed in the cause be considered by the trial court nor was there any effort made to read the deposition into evidence by authority of Rule 57.07. We have no information of record from which we may conclude that the trial judge

employed the contents of the deposition in arriving at his decision. On November 9, 1977, a memorandum was "added to the transcript" which was still in the process of preparation wherein the parties stipulated that the deposition of Ms. Kober be included as a part of the transcript in the cause. However, because we have no basis upon which to conclude that any use of the deposition was made by the trial court we have neither considered nor referred to the contents thereof.

tween them. *Forsythe v. Forsythe,* 558 S.W.2d 675, 678[1] (Mo.App.1977). To the extent a trial court has jurisdiction to divide marital property, it must specifically make a division of the marital property upon dissolving the marriage. *In re Marriage of Bradford,* 557 S.W.2d 720, 730[19] (Mo.App.1977). However, it has no jurisdiction to enter a decree dividing property which does not belong to either of the parties to the action, *V. M. v. L. M.,* 526 S.W.2d 947, 951[10] (Mo.App.1975), or which is not property acquired during the marriage or, having been acquired prior to the marriage or by gift, has not become so intermingled with the assets of the marriage partnership as to become marital property.

 The trial court, so far as we can discern, did not make a determination whether the Lonedell property was marital property. This was the most hotly contested issue tried. The threshold question confronting the trial court was whether this property belonged to these parties or whether, as respondent contended, it belonged to the two grantees in the quit claim deed. The trial court did not decide this issue.[7]

Neither party requested that the trial court make findings of fact and conclusions of law. However, the trial court, in a proceeding under the Dissolution of Marriage Act must determine the status of the property of the parties and, as to each asset or class of assets, must make a finding whether a particular item is property of a spouse individually or is marital property. § 452.-330, supra; *Anspach v. Anspach,* supra, l. c. 5[2]. The trial court did not comply with this mandate.

 Under the statute all property acquired subsequent to the marriage and prior to the decree of dissolution is pre-sumed to be marital property. All of the real property in evidence in this case was acquired by the parties subsequent to their marriage and prior to entry of the decree dissolving their marriage and, therefore, was presumptively marital property. *Forsythe v. Forsythe,* 558 S.W.2d 675, 678[2] (Mo.App.1977). The party attacking this presumption, regardless of the status of title to the property, has the burden of showing that the property falls within the statutory exception, *Jaeger v. Jaeger,* 547 S.W.2d 207, 210[2] (Mo.App.1977); *Boyers v. Boyers,* 565 S.W.2d 658, 660[8] (Mo.App. 1978); and the trial court may look behind the deed for the property acquired during the marriage to determine if the property was acquired by gift to either spouse and so exempt from division. *Forsythe v. Forsythe,* supra, l.c. 678[6].

The Werner's Sunset Lake property was acquired in 1965 while the parties were husband and wife. Appellant contended that it was marital property but respondent contended it was her sole property. The deed to this property was in respondent's name only. The trial court did not decide whether it was her sole property or whether it was marital property. Nevertheless, it was awarded to respondent. There was no evidence with respect to its market value at trial time, although in 1965 it was purchased for $750.00.

The lot at Table Rock, admittedly marital property, was awarded appellant. The record contains no evidence of the purchase price for this lot nor what its market value was in 1977 at the time this cause was tried and this decree entered.

Appellant was awarded a 1975 Chevrolet pick-up truck, acquired during the marriage. This too is presumptively marital property although he claimed he owned it.

---

7. We can detect from the transcript on appeal and from certain comments by counsel during the course of the trial and during oral argument in this court, that at the time of trial a second action was pending in another division of the circuit court of Jefferson County seeking a decree setting aside the quit claim deed to Ms. Kober and Ms. Rullkoetter brought by this appellant, wherein the respondent and the notary public are joined as co-defendants, but which the trial judge of the division in which it was pending refused to bring to trial until such time as we render our decision in this case. The pendency of this other cause may have influenced the trial court to refrain from making a finding whether the Lonedell property was marital property in this case.

There is nothing in this record from which we can ascertain its market value at time of purchase or at time of trial.

Respondent had a 1969 Chevrolet Belair automobile she claimed she owned. Although the record does not reveal when she purchased this car it too is presumptively martial property. The record is devoid of any evidence concerning the price paid for this motor vehicle or its fair market value at the time of trial. This vehicle was awarded respondent.

The household furnishings valued by respondent at $500.00 were awarded to her.

The sole remaining item, the "family home," valued by the appellant at $40,-000.00 constitutes the most valuable asset acquired by these parties during their approximately twenty-five and one-half year marriage.

In an effort to arrive at some estimate of the value of the Lonedell property we have made a painstaking study of this transcript because no one testified to its purchase price at the time it was acquired, sometime in 1956. We determined that the property was purchased in that year through respondent's testimony that it was purchased five years after the parties married. She also testified that there was a first and second mortgage on the property. Monthly payments on the first mortgage were $100.00, and on the second mortgage, $28.00. The first mortgage was to Gravois Home Loan and the sellers held the second mortgage.

In 1970, when the parties decided to build the new home they needed $6,000.00 according to respondent, to clear the property of these mortgages so they could make a loan sufficient to construct their new house. She said this came as a loan from her deceased uncle, Al Rosebeck. Appellant, on the other hand, testified that it came from the sale of their 16 acre farm at Otto, Missouri, for $5,000.00.

The record does not reveal when in 1956 the Lonedell property was purchased, nor exactly when in 1970 the mortgage or mortgages were satisfied. However, the loan for the construction of the new house was made on July 31, 1970, at the Bank of Concord Village for $12,000.00, the exact amount paid for his work to the contractor who built the new house. We may safely infer that the two mortgages from the purchase of the property had been paid off by that time.

Inasmuch as we cannot determine the exact date of purchase, we must draw inferences from the evidence to reach some conclusions on this question. Since the parties were married on October 19, 1951, and they purchased the property five years thereafter, we may infer that the purchase took place sometime between the fifth anniversary of their wedding and December, 1956. For purposes of simplifying the mathematics involved, and assuming that the first payment on the first mortgage was not made until December 1, 1956, there were approximately 160 payments of $100.00 each made between December 1956 and July 31, 1970, or $16,000.00. How much of this was for interest and how much was used to reduce the principal amount of the loan we do not know. We have no way to compute the amount paid on the second mortgage. The evidence does not show the amount of this loan, the interest, nor the number of installment payments necessary to pay it.

If we may infer these facts as aforesaid, the parties had made payments totalling $10,000.00 on the first mortgage—or $11,-000.00 if appellant's evidence is accepted as true—because it took $6,000.00 (or $5,000.00) to pay the balance due on the first mortgage before the loan for building the new home could be made on July 31, 1970.

The $12,000.00 loan of July 31, 1970 bore interest at the rate of 8% per annum and was payable in 60 equal monthly installments of $100.38. According to this note the first installment was payable the first day of December, 1970, and the final installment, on the first day of November, 1975. From respondent's testimony we learn that in January or February of 1965, when she began discussing the sale of the property to the sisters, she and appellant were three

months behind in their payments on the loan. If this is so, then the logical inference, in the absence of the record of payments, is that by that time 48 payments had been made, or approximately $4800.00. How much of this sum was applied against the principal was not shown in evidence and we do not possess the mathematical expertise required to prepare an amortization schedule which would furnish that data. We do, however, deduce that this was a "balloon note," and thus complicates our ability to arrive at these figures from the evidence in the record and determine what the balance due on the note on February 25, 1975, was when it was cancelled. We have taken the time to set out the facts above for the purpose of demonstrating that the lack of evidence upon which a review of the division of the marital property between the parties should be made, makes it impossible to determine whether said division constituted an abuse of discretion on the part of the trial court.

█ The statute requires a fair and equitable division of marital property; it does not require that there be an equal division in every case. *In re Marriage of Cornell,* 550 S.W.2d 823, 826[2] (Mo.App.1977). However, until it is determined whether the Lonedell Road property is marital property, it is impossible to ascertain whether the division of property attempted to be made by the decree entered in this case was just and equitable.

If the Lonedell property is not marital property, the division of that property which is admittedly marital property—the Table Rock Lake lot, the household furnishings and the two motor vehicles—may have been fairly equally divided. However, the trial court had no evidence from which to evaluate these items at the time he made the division and therefore could not have the information before him which would enable him to make the just division of the marital property which is the goal to be achieved in every case of division of marital property. *In re Marriage of Cornell,* supra, l.c. 826.

On the other hand, if the Lonedell property is marital property—and this depends of course upon the validity or invalidity of the quit claim deed—respondent is in a position to receive as her part of the marital property the entire "family home," subject of course, to the $10,000.00 the sisters gave her to pay off the balance of the loan for construction of the new house, and interest thereon. If the property has a fair market value of $40,000.00, she would then receive something less than $30,000.00 as her sole property.

If this results, the quit claim deed would have to be found to be a forgery and the respondent's conduct with respect to the execution of the fraudulent deed would have to be considered under the statute in any division made of this property. We cannot conceive that the trial court intended this result, should that be the case; for to so decide would amount to rewarding the respondent for her misconduct.

Therefore, we remand this case with directions to make a finding whether the Lonedell property is marital property; if the trial court finds and holds that it is, then to take further evidence to determine its fair market value so that a just and equitable division thereof can be made. A finding should also be made on whether the Werner's Sunset Lake property is marital property.

And when this has been accomplished, the trial court should proceed to hear further evidence on the value of the remainder of the marital property. When this is finished, it should order a just and equitable division of the marital property and set aside to either party that property, if any, held to be the separate property of either spouse.

█ Because we have remanded this case to the circuit court, and because one of the issues to be determined is the validity of the quit claim deed, we shall decide the only point the appellant preserved for review, i. e. whether the trial court erred in permitting Mr. Storer, the document examiner, to testify concerning the questioned signature for the reason he did not have properly

authenticated, competent standard handwriting with which to make comparisons.

We hold this point to be without merit.

The evidence we have referred to hereinabove demonstrates that respondent's testimony, if believed, established the authenticity of appellant's signature on the two notes employed as examples. She testified that both of these notes were signed by the appellant in her presence. Appellant himself, although somewhat equivocally, testified that the signatures on these notes looked like his but he did not remember signing them. At no time did he deny they were his.

▮ Comparison of a disputed signature with an authentic signature is authorized by § 490.640 RSMo. 1969. The authenticity of the signature to be employed as an exemplar for comparison with the disputed signature must be established to the satisfaction of the trial judge.

The method of proving the authenticity of a signature for exemplar purposes employed by respondent in this case has been approved in *Estate of Fedina v. Fedina*, 491 S.W.2d 552, 558, 559[3–4, 7–8] (Mo.1973), and the trial judge evidenced his satisfaction with the authenticity of the signatures on the two notes by permitting Mr. Storer to use them for comparison with the signatures on the quit claim deed and to testify that, in his opinion, all three signatures were written by the same hand. We find that in doing so the trial court did not err.

▮ Nevertheless, as we have said previously, we must remand this case for the taking of further evidence and rulings on material issues.

WEIER, C. J., and GUNN, P. J., concur.

APPENDIX

APPELLANT'S POINTS RELIED ON:

I.

THE TRIAL COURT ABUSED ITS JUDICIAL DISCRETION IN DIVIDING THE MARITAL PROPERTY AS SET FORTH IN THE DECREE OF DISSOLUTION ENTERED IN THIS CAUSE ON MAY 27, 1977.

II.

THE TRIAL COURT ERRED IN IGNORING PRINCIPLES OF EQUITY AND REWARDING THE PETITIONER FOR HER INIQUITY.

III.

THE TRIAL COURT ERRED IN PERMITTING THE SO-CALLED HANDWRITING EXPERT TO TESTIFY ON THE SUBJECT OF THE QUESTIONED SIGNATURE BECAUSE THE EXPERT DID NOT HAVE PROPERLY AUTHENTICATED COMPETENT STANDARD HANDWRITINGS WITH WHICH TO MAKE COMPARISON.

IV.

THE TRIAL COURT ERRED IN ITS DECREE BY AWARDING MAINTENANCE TO PETITIONER IN THE SUM OF $50.00 PER WEEK AS SUCH CONSTITUTED AN ABUSE OF DISCRETION UNDER THE CIRCUMSTANCES.

V.

THE TRIAL COURT ERRED IN ALLOWING THE PETITIONER TO TESTIFY, OVER PROPER AND TIMELY OBJECTION BY RESPONDENT, FROM HER ANSWERS TO INTERROGATORIES WITHOUT ANY PROPER FOUNDATION HAVING BEEN ESTABLISHED.

VI.

THE TRIAL COURT ERRED IN PERMITTING PETITIONER TO ADDUCE TESTIMONY RELATING TO THE GOOD REPUTATION OF PETITIONER.