In re the MARRIAGE OF Robert MELTON and Sue Melton.

**Robert MELTON, Respondent,**

v.

**Sue MELTON, Appellant.**

No. 17300.

Missouri Court of Appeals,
Southern District,
Division One.

Aug. 26, 1991.
Rehearing Denied Sept. 17, 1991.

Loren R. Honecker, Sherwood, Honecker & Bender, Springfield, for appellant.

Richard E. Dorr, Dorr, Baird and Lightner, P.C., Springfield, for respondent.

CROW, Judge.

The marriage of Robert H. Melton and Sue Melton[1] was dissolved by decree entered May 16, 1990. The decree, comprising 51 pages including schedules of sundry classifications of property, provided for the division of an item of marital property characterized "the Robert H. Melton, D.D.S., P.C., pension and profit sharing plan assets."

On September 21, 1990, more than four months after entry of the decree, Sue filed in the trial court a "Motion to Determine Judgment Amount," averring the decree awarded her assets from the Plan "equal to one-half of the total value thereof but not less than the fair market value of $165,-260.00." The motion prayed the trial court for an order "determining the value of one-half interest in the ... Plan as of May 16, 1990 to be the sum of $206,707.05," and for such other relief as the court deemed just and proper.

Because the judge who entered the dissolution decree had retired prior to the filing of Sue's motion, the proceedings on the motion were conducted by the successor judge. Following an evidentiary hearing, that judge entered an order December 3, 1990, finding the value of the "vested funds" in the Plan was such that half the value as of the date of the dissolution decree was less than $165,000. The trial court ruled the amount due Sue from Robert in payment of half the assets of the Plan was $165,260. The trial court found Robert had transferred assets to Sue from the Plan "in excess of the minimum amount required to be distributed by the decree." Consequently, the trial court held the provision of the decree awarding Sue an interest in the Plan had been satisfied.

Sue appeals from the order of December 3, 1990. Her brief presents two assignments of error. Before addressing them, we set forth the relevant provisions of the dissolution decree.

On page 13 the decree reads:

"The Court ... finds ... Sue ... should be awarded as a division of the marital property ... an undivided one-half interest in the Robert H. Melton, D.D.S., P.C., pension and profit sharing plan assets specifically set forth on Schedule 'B–1', items 4(a) through 4(d)...."

On page 30 the decree reads:

"It is further ordered, adjudged and decreed that ... [Sue] ... shall receive as a further division of the marital property the following items set forth in Schedule 'B–1', as follows:

1. For convenience, we henceforth refer to the parties by their respective first names.

SCHEDULE 'B–1'

. . . .

Pension Assets (Paragraph 4(a) through (d)):

4. Undivided one-half interest in the vested funds in Robert H. Melton, $165,260.00 D.D.S., P.C., Employees' Pension Plan and Trust (PN–001) and Employees' Profit Sharing Plan and Trust (PN–002) $306,520.00, 12–31–88, plus $24,000.00 interest (1989) comprised of the following combined Pension/Profit Sharing Assets, including any replacements or additions thereto, and including earnings and income, through the date of this Decree:

( ... Robert ... is directed and ordered to advise the Court in writing with a copy to [Sue's] attorney of record within seven (7) days from the date of this Decree as to whether there are any additions, corrections, or replacements of the following pension/profit sharing assets or changes in the amounts thereof so that the Court can amend its Decree to reflect same.)

a. Pudget [sic] Sound Power & Light Co. Account No. 0000056386, 62.1405 shares Common Stock $1,178.00 (Plus dividends reinvested or accrued through 3–01–90)

b. Lodge of the Ozarks, Inc. (Roy Clark Theatre) Capital Stock in the name of Robert H. Melton Certificate Number 13, 900 shares $1.00 par, ($25,000.00 FMV) (Plus all accrued and unpaid dividends)

c. Empire Bank special account, 'Securities Account'
Account No. 445461814, Number 401–664–1
700 shares General Motors (7–12–88)
1. IMMA,      $ 66,595.56
2. Securities, $ 54,162.50
   Total:      $120,758.06
($120,758.00 FMV)
(Plus all accrued earnings after 7–12–88)

d. Certificates of Deposit
   1. Gill Savings Association, Certificate No. 0253510907 Issued 11–27–87 (12 month) ($25,000.00 FMV) (Plus all accrued interest)

   2. Gill Savings Association, Certificate No. 0253510897 Issued 11–27–87 (6 month) ($25,000.00 FMV) (Plus all accrued interest)

   3. Empire Bank of Springfield, *(Gill CDs # 1 and # 2 above merged in this account)

   4. Shearson Lehman, California Federal Savings & Loan Certificate No. 4992344814 Issued 04–03–89 (3 month) ($100,000.00 FMV) (Plus all accrued interest)

   5. Sunbelt Savings, Dallas, TX Certificate No. 0549797291 Issued 04–04–89 (1 year) ($50,000.00 FMV) (Plus all accrued interest)[.]''

---

On page 37 the decree reads:

"... Robert ... shall take all necessary steps to complete within thirty (30) days from the date of this Decree the transfer to ... Sue ... and the vesting thereof in the name of [Sue], and delivery to [Sue] assets from the Robert H. Melton, D.D.S., P.C., Pension and Profit Sharing Plan, equal to one-half the total value thereof but not less than the fair market value of $165,260.00, and for which sum ... Sue ... shall have judg-

ment against ... Robert ... until pension and profit sharing assets equal to said sum are delivered and vested in [Sue's] name by [Robert]. Interest shall not accrue on said judgment if said pension plan assets are timely transferred as provided herein, except beginning thirty-one (31) days from the date of this Decree. The cost of said transfer shall be at [Robert's] separate expense. [Robert] shall, within forty-five (45) days from the date of this Decree, file a written report with the Court evidencing what assets have been transferred to [Sue] and the value thereof at the time of transfer, and shall verify delivery of the documents of ownership to [Sue] by providing a copy of the written receipt thereof signed by [Sue] or other documents establishing delivery thereof."

Sue's motion of September 21, 1990, averred the assets in the Plan[2] as of the date of the dissolution decree were:

| | |
|---|---:|
| Puget Sound Power & Light Co., common stock, 74.0324 shares @ $20.53 per share | $ 1,519.88 |
| Lodge of the Ozarks, Inc., 25,000 shares @ $1 par value | 25,000.00 |
| Empire Bank special account, "Securities Account" | 165,476.76 |
| Empire Bank certificate of deposit number 000083479 | 54,653.51 |
| Shearson Lehman Hutton Inc., account number 499–23448–14 (combined money funds and stocks) | 116,763.98 |
| Sunbelt Savings certificate number 0549797291 | 50,000.00 |

The aggregate value of the above assets, according to Sue's motion, is $413,414.11. (Our addition produces a sum of $413,-414.13.) Consequently, pled Sue, the value of her half interest in the Plan should be declared to be $206,707.05.

At the hearing on her motion, Sue pointed out that in the decree, the trial court gave the Empire Bank special account "Securities Account" an aggregate value of $120,758.06 as of July 12, 1988 (some 22 months prior to the decree). Sue presented to the trial court a 40–page document (Exhibit D) identified as a statement of activity in that account from July 12, 1988, through the date of the decree. According to Sue, Exhibit D showed, among other things: (a) the balance of the account as of July 12, 1988, was $120,758.06, and (b) from July 12, 1988, through May 16, 1990 (date of the decree), Robert made deposits totaling $206,335.82 and withdrawals totaling $251,-054.52.

Sue tendered a novel argument. She began with the premise that Robert was not obliged to deposit assets in the account, hence anything he put in was his money.

She therefore *subtracted* the *deposits* "on the theory that he could have put them somewhere else and it wouldn't have been in this account." However, reasoned Sue, if Robert withdrew assets from the account he should be barred from saying the account was thereby reduced in value. Sue's lawyer explained, "So I subtracted the deposits and I added the withdrawals because I don't think he is liable for the deposits and I don't think he's entitled to credit for the withdrawals."

Applying this rationale, Sue maintained the trial court should declare the balance of the account as of the date of the decree was $165,476.76, the figure set forth in her motion.

Robert's lawyer told the trial court some of the withdrawals from the account were for purchase of assets that went into the Plan and were later distributed (a) to Sue per the dissolution decree, and (b) to employee-participants in the Plan. According to Robert's lawyer, there were stocks in four corporations in the Plan at the time of the dissolution decree: Puget Sound Power & Light Co., General Motors, McDonald's, and Lodge of the Ozarks, Inc. Robert's

**2.** For convenience, we henceforth refer to the Robert H. Melton, D.D.S., P.C., pension and profit sharing plan as "the Plan."

lawyer stated all stock in the first three companies had been distributed to Sue, and the aggregate value of such stock at the time of the decree exceeded $165,000.

Sue presented only documentary evidence in support of her motion. In response, Robert testified about some of the deposits to and withdrawals from the Empire Bank special account "Securities Account" during the period from July 12, 1988, until entry of the dissolution decree. We summarize only his testimony pertinent to Sue's claims of error.

Robert related he is an employee of the corporation "Robert H. Melton, D.D.S., P.C.," and was a participant in the Plan. The corporation employed other persons; some were participants in the Plan, some were not.

Asked about a $100,000 withdrawal from the account April 4, 1989, Robert testified it went to Shearson Lehman to purchase a $100,000 certificate of deposit. (Schedule B–1 in the dissolution decree, *supra*, lists item 4.d.4 as a $100,000 certificate of deposit issued April 3, 1989, identified as "Shearson Lehman, California Federal Savings & Loan.") Robert explained that when the certificate matured, the money ("approximately $100,000") was used to purchase McDonald's stock. That stock, said Robert, had since been transferred to Sue. A statement from Shearson Lehman dated May 27, 1990, showed the value of the McDonald's stock as $103,125.

Robert testified a $50,000 withdrawal June 1, 1989, was used to purchase a certificate of deposit held by Empire Bank as security for a loan against Robert's "Joplin practice."

Asked about a $9,086.50 withdrawal June 23, 1989, Robert explained it was a check to one of the participants in the Plan, Mary Ray, "cashing out her vested interest in the plan."

Robert identified a $19,384.84 withdrawal December 15, 1989, as a distribution to another Plan participant, Ida Guynn,[3] of her vested interest.

Robert identified a $4,419.73 withdrawal April 17, 1990, as a distribution to another Plan participant, Kathy Hough, of her vested interest.

At the conclusion of the evidence on Sue's motion (Robert was the only witness), the trial court undertook to calculate the value of the assets in the Plan as of the date of the dissolution decree. The trial court found:

| Asset | Value [4] |
|---|---|
| Puget Sound Power & Light Co., stock | $ 1,519 |
| McDonald's stock | 103,125 |
| Lodge of the Ozarks, Inc., stock | 25,000 |
| Empire Bank certificate of deposit number 000083479 | 54,653 |
| Sunbelt certificate of deposit (evidently item 4.d.5, Schedule B–1 in the dissolution decree, *supra* ) | 54,896 |
| Empire Bank special account | 78,808 |

To differentiate the above list from Schedule B–1 in the dissolution decree, we henceforth refer to the above list as the "roll of assets."

The trial court declared the sum of the values in the roll of assets was $298,000. Sue points out, and Robert concedes, the trial court's arithmetic was wrong. The correct total is $318,001.

---

**3.** The surname appears as "Guinn" in the transcript and as "Guynn" on IRS "tax forms" received in evidence.

**4.** The trial court announced: "We'll just do this in round numbers, but I'll just drop the numbers on the end."

The trial court gave the parties the following explanation regarding the $78,808 value the court assigned the Empire Bank special account. The court began with the balance as of July 12, 1988: $120,758 (excluding pennies). The court then examined the deposits to the account during the period from July 12, 1988, to entry of the dissolution decree. One of those deposits was $54,896.04 on April 6, 1990. Robert testified the funds for that deposit were the proceeds of a Sunbelt certificate of deposit that matured. (Schedule B–1 in the dissolution decree, *supra,* lists item 4.d.5 as a $50,000 certificate of deposit issued April 4, 1989, identified as "Sunbelt Savings.") Inasmuch as the roll of assets lists the Sunbelt certificate as a separate item valued at $54,896, excluding it from the deposits was necessary to prevent it being counted twice.

The trial court also reduced the account by deducting three other items: (1) $103,-125, the value of the McDonald's stock separately listed in the roll of assets, (2) $50,000, the sum Robert testified was withdrawn June 1, 1989, to purchase the certificate of deposit held by Empire Bank, separately listed at $54,653 in the roll of assets, and (3) the withdrawals of $9,086.50 for Mary Ray, $19,384.84 for Ida Guynn, and $4,419.73 for Kathy Hough, representing distribution of their respective interests in the Plan.

These calculations (and others), said the trial court, produced the $78,808 value assigned the account.

Sue's first point relied on:

"The trial court erred in calculating the value of the assets of the … Plan … because the trial court incorrectly totalled the values assigned, improperly omitted funds in the Shearson Lehman account and improperly allowed credit for employee "cash-outs", in that the sum of the assets stated was $318,001 (not $298,000), the Shearson Lehman account included "money funds" in addition to stocks, and [Robert] should have been barred from claiming credits for employee "cash-outs" by the doctrine of res judicata."

The point attacks the trial court's calculations in three respects. We address them—and only them—in order.

The first is the trial court's addition of the values it assigned in the roll of assets. This attack is meritorious. As reported earlier, the correct sum of the values assigned by the trial court is $318,001.

Sue's second attack is that the roll of assets should have included an additional $13,638.96 in "money funds" held in the Shearson Lehman account. Sue points out that the statement from Shearson Lehman which showed the value of the McDonald's stock as $103,125 also listed "money funds" worth $13,638.96.

In his brief, Robert agrees the "money funds" of $13,638.96 should be included in the roll of assets. Consequently, Sue's second attack on the trial court's calculations is also meritorious.

■ Sue's third attack is that the trial court improperly reduced the value of the Plan's assets by deducting the "cash-outs" paid employees Mary Ray, Ida Guynn, and Kathy Hough. Those payments ($9,086.50, $19,384.84, and $4,419.73, respectively) total $32,891.07. Sue reminds us the dissolution decree made no mention of any interest in the Plan owned by third parties, nor did the decree award her assets equal to half the value of the Plan after deductions for others' interests. Sue maintains that if Robert wished to claim that a portion of the Plan's assets represented interests of third parties, he had ample opportunity, indeed a duty, to do so.

Sue directs us to the passage in Schedule B–1 of the dissolution decree (quoted earlier) directing Robert to advise the court in writing within seven days after entry of the decree as to whether there were additions, corrections, or replacements of the assets of the Plan listed in Schedule B–1. Sue argues that because Robert did nothing in response to this directive, his claim for credit for the "cash-out" payments is barred by res judicata.

As a result, says Sue, we should hold the aggregate value of assets in the Plan as of the date of the dissolution decree was

$364,531.03. Sue arrives at this figure by beginning with the mathematically correct sum of the values in the roll of assets compiled by the trial court: $318,001. To this figure, Sue adds the $13,638.96 in "money funds" in the Shearson Lehman account and the "cash-out" payments totaling $32,891.07. The sum of the three amounts in the two preceding sentences is $364,531.03. Half that is $182,265.51. Sue asserts the latter figure is the value of Plan assets to which the dissolution decree entitles her.

Sue has obviously lowered her sights on appeal. As we have seen, her motion in the trial court averred she should receive Plan assets valued at $206,707.05.

We find no merit in Sue's res judicata argument.

Earlier, we set forth excerpts from the dissolution decree. The excerpt from page 13 of the decree states Sue should be awarded an undivided one-half interest in the Plan assets "specifically set forth on Schedule 'B–1', items 4(a) through 4(d)."

Items 4.a through 4.d (also set forth earlier) describe specific assets and assign them specific values. The sum of those values, according to our addition, is $346,936.06. Furthermore, there are provisos that accrued dividends are to accompany the assets listed as items 4.a and 4.b, and provisos that accrued interest is to accompany the assets listed as items 4.c, 4.d.1, 4.d.2, 4.d.4, and 4.d.5. Given these provisos, it is impossible to determine from the decree the dollar value of the assets identified as items 4.a through 4.d. on Schedule B–1.

Additionally, paragraph 4 of schedule B–1 states Sue is awarded an undivided one-half interest in the vested funds in the Plan: "$306,520.00, 12–31–88, plus $24,000.00 interest (1989) comprised of the following combined ... Assets, including any replacements or additions thereto, and including earnings and income, through the date of this Decree." The sum of the two figures in the preceding sentence is $330,520, some $16,000 *less* than the sum of the

individually assigned values of items 4.a through 4.d. Thus, paragraph 4 has a built-in ambiguity.

The excerpt from page 37 of the dissolution decree (set forth earlier) states Robert shall transfer to Sue assets from the Plan "equal to one-half the total value thereof but not less than the fair market value of $165,260.00," and awards Sue judgment against Robert until Plan assets "equal to said sum" are vested in Sue's name.

■ A judgment for money which does not state a sum certain and which requires evidence beyond the record to ascertain the amount due is void on its face. *Massey v. Massey*, 594 S.W.2d 296, 297[1] (Mo.App. 1979); *Rodden v. Rodden*, 527 S.W.2d 41, 43[7, 8] (Mo.App.1975); *Loomstein v. Mercantile Trust National Ass'n.*, 507 S.W.2d 669, 670–71[1, 2] (Mo.App.1974). As explained in *Massey*, an obscure judgment may be construed with reference to the pleadings and record, and where on the whole record its sense can be clearly ascertained, the judgment will be upheld. 594 S.W.2d at 298. This exception applies to the amount of the judgment. *Id.*

Here, however, the exception does not rescue the portions of the decree awarding Sue a one-half interest in the Plan assets. As we have seen, paragraph 4 of Schedule B–1 in the decree sets forth two amounts totaling $330,520. That figure obviously prompted the provision that Sue was to receive Plan assets with a fair market value not less than $165,260. But even paragraph 4 includes "any replacements or additions" to the Plan assets, together with earnings and income through the date of the decree. The assets specifically identified and valued in paragraphs 4.a through 4.d of Schedule B–1 (the assigned values of which total $346,936.06) are to be accompanied by their respective accrued dividends and interest. Obviously, those amounts are not ascertainable from the decree, and in all likelihood are not ascertainable from anything that could be seined from the record.[5]

<hr/>

5. The transcript does not include the testimony at the dissolution trial, but only the testimony at the hearing on Sue's motion. No exhibit received at that hearing shows the accrued divi-

Indeed, Sue's motion of September 21, 1990, tacitly concedes as much, as it (a) avers a dispute arose between the parties after entry of the dissolution decree regarding the proper valuation of the Plan assets, and (b) prays the trial court to declare the value of Sue's interest in the Plan assets as $206,707.05, a figure she has now abandoned.

Applying *Massey, Rodden,* and *Loomstein,* we hold the provisions of the dissolution decree awarding Sue the undivided one-half interest in the Plan assets are void because the dollar value of the assets she is to receive cannot be determined from those provisions or by reference to the pleadings and record. We emphasize the decree does not award Sue any specific, identifiable Plan assets, but instead provides she is to receive Plan assets of the fair market value of half an amount that cannot be calculated from the decree or the record. Had the decree awarded Sue specific, identifiable Plan assets, this defect would not exist. However, we take the decree as we find it, and we find the provisions awarding Sue an undivided half interest in the Plan assets void for ambiguity and uncertainty.

■ A void judgment may not be used as a basis for application of the doctrine of res judicata. *Berry v. Chitwood,* 362 S.W.2d 515, 517[4] (Mo.1962). Consequently, in adjudicating Sue's motion of September 21, 1990, the trial court was not barred by res judicata from holding the amounts withdrawn from the Plan as vested interests of employees Ray, Guynn, and Hough should be deducted from the Plan assets.

■ The scope of our review of this judge-tried case is established by Rule 73.01(c), Missouri Rules of Civil Procedure (1991), as construed by *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976). The judgment of the trial court will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. *Id.* at 32[1]. Credibility of the witnesses and the weight to be given their testimony is a matter for the trial court, which is free to believe none, part, or all of their testimony. *Herbert v. Harl,* 757 S.W.2d 585, 587[1] (Mo. banc 1988).

■ The trial court obviously believed Robert's testimony regarding the $32,891.07 paid, in the aggregate, to employees Ray, Guynn, and Hough as their respective interests in the Plan. Robert's testimony amply supports the trial court's implicit finding that such sum did not constitute marital property. As such sum was not marital property, the trial court had no authority to divide it between Robert and Sue. *In re Marriage of Ward,* 659 S.W.2d 605, 607 (Mo.App.1983); *In re Marriage of Schulz,* 583 S.W.2d 735, 741–42[6] (Mo.App. 1979).

We therefore reject Sue's contention that the trial court erred in reducing the value of the Plan assets by $32,891.07, the total "cash-outs" to employees Ray, Guynn, and Hough.

Having ruled on Sue's three complaints of error in her first point—upholding her first two complaints and rejecting her third—we reach the following result. The mathematically correct sum of the values assigned the Plan assets by the trial court in its roll of assets is $318,001. To this we add the "money funds" of $13,638.96, producing a total of $331,639.96. As Sue's only other attack on the trial court's calculations is the complaint about the "cash-outs," which we have rejected, we hold $331,639.96 is the value to be assigned the Plan assets as of the date of entry of the dissolution decree.

Having reached that conclusion, and mindful that the decree awards Sue assets from the Plan "equal to one-half the total value thereof but not less than the fair market value of $165,260.00," we must determine what is half of $331,639.96. Our arithmetic reveals half that amount is $165,819.98.

dends and interest on all items listed in paragraph 4 of Schedule B–1 of the dissolution de-

cree as of the date of its entry.

As we have seen, in the order from which Sue appeals the trial court held the amount due Sue from Robert in payment of half the assets in the Plan was $165,260. The trial court found Robert had transferred Plan assets to Sue in excess of that amount, but the trial court made no finding as to the precise value of such assets. Consequently, there is no finding that Sue has received Plan assets worth $165,819.98, the amount to which we have held she is entitled.[6]

The order appealed from must therefore be reversed and the case must be remanded for a determination by the trial court of the value of Plan assets Sue has received. Until that determination is made, an issue will exist as to whether Sue has gotten what she is due.

■ In reaching this conclusion we do not overlook a contention by Robert that the true aggregate value of assets in the Plan on the date of entry of the dissolution decree was $296,554.26, half of which is $148,277.13. Robert maintains that inasmuch as the trial court found Sue had received Plan assets worth more than $165,260, the errors complained of by Sue in her first point are harmless.

Robert asserts (a) the trial court's roll of assets should not have included the Sunbelt certificate of deposit, but instead $64,050 worth of General Motors stock "now 1,400 shares because of a split," and (b) the trial court should have found the balance in the Empire Bank special account was $34,-568.30 instead of $78,808. Robert argues propositions "(a)" and "(b)" are established by the documentary evidence presented by Sue.

We have studied the evidence to which Robert directs us. On Exhibit D—a 40-page Xerox copy of a statement of activity in the Empire Bank special account covering a two-year period ending June 12, 1990,

and containing innumerable entries—we find an entry that appears to show there were 1,400 shares of General Motors stock in the account's portfolio as of May 11, 1990 (five days before entry of the dissolution decree). According to Exhibit D, those shares had an "estimated market price" of $64,050.

Even if Robert—and we—interpret Exhibit D correctly, it does not show the market price of the stock, but only an *estimated* market price. Furthermore, the date of such price is five days before entry of the dissolution decree. Robert directs us to no evidence, and we find none, establishing the fair market value of the General Motors stock on the date of the dissolution decree. This gap in the proof is alone sufficient to reject Robert's argument. We therefore need not address any of his other attacks on the trial court's values in the roll of assets.

We note, however, that even were we to find them valid, Robert would likely realize no benefit. We have held—based strictly on the issues presented in the briefs—Sue should receive Plan assets of the fair market value of $165,819.98. According to Robert, he has already transferred to Sue assets from the Plan having an aggregate fair market value of $168,694.88. He does not contend Sue should return any of them.

This brings us to Sue's second point, which reads:

"The trial court erred in decreeing satisfaction of that portion of the judgment involved herein because said ruling is supported neither by pleadings nor substantial evidence ... in that the only issue before the trial court was the amount of the judgment, and [Robert] adduced no evidence of the date and value of assets transferred."

Sue's arguments on this point include the contention that the value of Plan assets

---

**6.** Neither side disputes the premise that Sue should receive assets from the Plan equal to half the aggregate value of the Plan assets as of the date of the dissolution decree. The parties' quarrel concerns (1) which assets were in the Plan as of the date of the decree, and (2) their value. As these are the issues the parties litigated in the trial court, we consider no others, nor

need we express any view about the advisability of attempting to value assets as of the date of entry of a dissolution decree. We note, however, that the Supreme Court of Missouri has held the proper date for valuing marital property in a dissolution case is the date of trial. *Taylor v. Taylor,* 736 S.W.2d 388, 391[2] (Mo. banc 1987).

transferred to her in satisfaction of the dissolution decree must be fixed as of the date of *transfer*, not the date of *entry of the decree*. Sue also points out that one of the assets Robert claims to have transferred to her is the Puget Sound Power & Light stock. Sue emphasizes Robert testified he had "completed all the paperwork to do that," but there was no evidence the transfer of ownership had been accomplished.

We need not address those arguments. In adjudicating Sue's first point—we again emphasize we considered only the claims of error asserted therein—we held $331,-639.96 was the value to be assigned the Plan assets as of the date of entry of the dissolution decree. There was no finding by the trial court that Sue had received Plan assets equal to half that sum. That is reason enough to reverse the trial court's holding that the portion of the decree awarding Sue the interest in the Plan assets has been satisfied.

The order of December 3, 1990, is reversed, and the case is remanded for further proceedings consistent with this opinion.

PREWITT, P.J., and PARRISH, J., concur.